NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

RANDALL K. VENZIE,                  :
                                    :
              Petitioner,           :          Civil Action No. 11-7404 (RBK)
                                    :
       v.                           :                **O P I N I O N**
                                    :
MEG A. YATAURO et al.,              :
                                    :
              Respondents.          :

---

**Kugler,** District Judge:

 Petitioner Randall K. Venzie ("Petitioner") filed a Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254(a), challenging a judgment of conviction entered by the Superior Court of New Jersey. See Docket Entry No. 1. This Court directed re-pleading (and, in conjunction with the same, advised Petitioner of his rights under Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000)), and ordered Respondents to file a limited answer as to timeliness/exhaustion. See Docket Entries Nos. 2 to 9 (The Court's orders and the parties' replies). The Court then directed an answer on merits; Respondents duly complied and Petitioner traversed. See Docket Entries Nos. 10, 11 and 17. For the reasons expressed below, the Court will dismiss the Petition and decline to issue a certificate of appealability. See 28 U.S.C. §§ 2253(c), 2254(a), (b), (c).

## I. BACKGROUND

 While Petitioner's claims are not complex, the factual predicate underlying his challenges is rather dense. The Court, therefore, finds it warranted to carefully detail the record presented to the state courts. Accord Cullen v. Pinholster, 131 S. Ct. 1388 (2011).

The victim of Petitioner's offenses was his daughter ("Daughter"), who was initially his and his wife's ("Mother") foster child, later formally adopted, together with the Daughter's two brothers, by Petitioner and the Mother.  Petitioner was a successful optician who ran his own business.[1]  When the Daughter turn six years old, Petitioner started systemically fondling her, especially when, after nightmares, she sought refuge in his and the Mother's bed.  By the time the Daughter was eleven, Petitioner's conduct began to encompass oral and digital penetration, and then swiftly progressed to showing the Daughter magazine pornography, as well as pornographic video and computer images.

Apparently, when the Daughter was ten, she tried to discuss Petitioner's conduct with the Mother, but the Mother did not believe her timid statements and brushed them off.  Three years later, when the Daughter  turned thirteen, she confronted Petitioner about the ongoing abuse, and he promised to stop it but, after a lull, resumed.  When she finally reached sixteen, the Daughter threatened Petitioner with calling the police if the abuse would not stop.  The threat had its desired effect and, two months after that confrontation, Petitioner apologized and stopped.

Shortly thereafter, by then being seventeen, the Daughter wrote Petitioner a letter opining that he should confess the decade of abuse to the Mother.  The letter, apparently not sent, was found by the Mother a few months later, causing her to discuss the whole ordeal with the Daughter.  During that conversation, the Daughter did not disclose the details of Petitioner's conduct; rather, a few days later, she wrote an another letter to Petitioner informing him that she

---

[1]  At all relevant times, Petitioner was a mature individual.  See <<https://www6.state.nj.us/DOC_Inmate/details?x=1295446&n=0>> (indicating that Petitioner was born in 1951).

shared the fact of abuse with the Mother.  At that point, the Mother, too, wrote Petitioner a letter and, a few days later, reported Petitioner's conduct to certain church members and the police.

The first law enforcement officer assigned to investigate that matter was Trooper William Gant ("Gant").  He met with the Mother and Daughter the same day; during that meeting, the Mother, being understandably shaken by what was unfolding, could not talk much and merely handed Gant a piece of paper with the word "fondling" written on it, as well as the three above-detailed letters.  Gant took the Daughter to a local police station and interviewed her.  Having obtained the Daughter's consent and a court order permitting him a telephone intercept, Gant had the Daughter call Petitioner in same evening.  During that conversation, Petitioner admitted "petting" the Daughter and having a problem with pornography, but denied penetration; he asked the Daughter for forgiveness.

The same evening, Gant and another Trooper, Jason Ianella ("Ianella") arrived to Petitioner's place of business and arrested him in the presence of his son.  During the arrest, Petitioner asked Gant what was going on but, mindful of the emotions Petitioner's son might have experienced had he learned of the basis for the arrest, Gant merely responded by, "You know."  Once he placed Petitioner in custody, Gant informed Petitioner of his Miranda rights even though neither Gant nor Ianella attempted to interrogate Petitioner at that juncture.

Petitioner was taken to the police station, while his son was left at the place of business.  During the ride, Gant and Ianella received a call from one of the station officers informing them of a certain issue relevant to the Daughter had come up but, since Petitioner was present in Gant and Ianella's vehicle, no specifics were disclosed.  No interrogation took place during that ride.

Upon arriving to the station, Gant placed Petitioner in a processing room and secured him to a bench; with that, he proceeded to inquire with the local police about what had happened with the Daughter. The station officer informed Gant that Petitioner's son (left at place of business) called the Daughter and promised to kill whoever caused Petitioner's arrest. Not surprisingly, Gant informed the appropriate law enforcement officials of the son's threat.

With that, Gant returned to the processing room, informed Petitioner that he intercepted and listened on the phone conversation between Petitioner and the Daughter, transferred Petitioner to the interview room and re-administered the <u>Miranda</u> warning, this time by utilizing a pre-printed form. Petitioner was expressly asked if he understood his rights and acknowledged so; he signed the pre-printed form, as did Gant. It was 10:02 p.m.

Once Petitioner signed the form, Gant asked whether Petitioner wished to waive his right to remain silent. To that, Petitioner responded with, "I think I might want to talk to a lawyer." Gant, thus, did not interrogate Petitioner; rather, he returned Petitioner back to the holding room. With that, Gant left to inquire about Petitioner's bail and processing of the arrest warrant.

About twenty to twenty-five minutes later, Gant came back to inform Petitioner about the bail and warrant, but Petitioner pre-empted that conversation by asking about what would happen to him and where were the Mother and Daughter. Gant said that he could not talk to Petitioner at all in light of the operations of <u>Miranda</u>; that response prompted Petitioner to say, "I'll talk to you." Gant, in response, expressly asked Petitioner whether he was sure he wished to speak to Gant without having a lawyer present, and Petitioner confirmed by saying yes.

Correspondingly, Gant stated that the Mother and Daughter were secured at a certain safe undisclosed location since Petitioner was barred from contacting the Daughter. With that, Gant

4

moved Petitioner to the interview room and asked a police sergeant to be present during the interrogation; the sergeant complied.

The interrogation began by Gant re-administering, for the third time, the Miranda warning to Petitioner.  Again, Gant utilized a pre-printed form, which Petitioner – this time – signed twice: first at the top to verify that he understood his Miranda rights, and second time at the bottom, so to verify that he was waiving these rights.  It was 10:46 p.m.

Once again, Gant informed Petitioner that he intercepted and listened on the phone conversation between Petitioner and the Daughter and asked Petitioner to elaborate.  In response, Petitioner made an hour-long statement detailing his abuse of the Daughter.  Upon conclusion of that account, he agreed to reiterate the same for the audio-recording purposes.  Having obtained Petitioner's agreement to have his confession taped, Gant re-administered, by now the fourth time around, the Miranda warning.  In conjunction with that, Gant expressly pointed out the fact that Petitioner, at the outset of his in-station presence, indicated his interest in speaking to a lawyer.  In response, Petitioner stated that he understood his Miranda rights and was willing to repeat his confession, for the taping purposes, without a lawyer present.   This taped confession started at 12:35 a.m. and finished almost an hour later, at 1:24 a.m.  When transcribed, it yielded twenty-nine pages of a detailed account consisting of lengthy narrative statements.

During his criminal prosecution, Petitioner moved for suppression of his non-taped and taped confessions.  Petitioner maintained that both confessions were coerced claiming that

> he had requested a lawyer on five occasions while he was initially in the interview room, that he had only consented to talk because of concern regarding his family arising from threats of violence by [his son] and because he thought his cooperation would "get something smoothed out," and that his confession was premised upon information garnered from his conversation with the police and

was untrue. [Petitioner ]did not explain the origin of the extensive factual
information that he provided in the last five pages of the transcribed document
after police questioning had ceased or the source of his knowledge concerning
other lengthy portions of the confession given in response to factually nonspecific,
open-ended inquiries by Gant.

State v. R.K.V., 2005 WL 3488049, at *4 (N.J. Super. Ct. App. Div. Dec. 22, 2005).

The trial court denied Petitioner's suppression motion, and Petitioner's criminal case
eventually proceeded to a jury trial on the indictment based on a score of state provisions
addressing the matters of sexual assault and child endangerment; these provisions differed
depending on victim's age and forms of abuse.[2]   Petitioner's jurors found him guilty of all
charges, except for the  sexual assault at the time when the Daughter was ten: the jury was
deadlocked on that charge.

Upon Petitioner's conviction, the trial court merged the corresponding groups of
endangerment and sexual assault charges and imposed a string of concurrent sentences yielding
an aggregate total of twenty-eight years minimum and sixty-seven years maximum; the trial court
made this term subject to the No Early Release Act ("NERA").[3]  On direct appeal, his conviction
and sentences were affirmed, short of the NERA component, which was vacated.  No post-
conviction relief proceedings ensued due to the length of the direct appellate process.

The Petition within followed.

---

[2]  Hence, Petitioner was first charged with a sexual assault during the years when the
Daughter was six through nine, then with a sexual assault during the years when the Daughter
was ten through thirteen, then with endangering the welfare of a minor during the years when age
was six through fourteen, then with a sexual assault during the years when she age fourteen and
fifteen, and finally with a sexual assault when she was sixteen.

[3] Petitioner was found "amenable to treatment as a sexual offender at the Adult
Diagnostic and Treatment Center at Av[e]nel," see id. at *1, and he is now confined accordingly.

## II.      PETITIONER'S CHALLENGES AT BAR

Petitioner's Ground One asserts that his <u>Miranda</u> rights were violated, and both his

confessions were involuntary, not intelligently consented and coerced by Gant who unduly

capitalized on Petitioner's concerns about his son, the Daughter and Mother.  His Ground Two

asserts that he was sentenced too harshly in comparison with others who committed analogous

offenses, and his Ground Three effectively reiterates the same by alleging that his aggregate

sentence was a cruel and unusual punishment.  Petitioner's Ground Four expresses Petitioner's

disappointment with the fact that his two confessions did not afford him a shorter aggregate

sentence.   His Ground Five alleges that, under the New Jersey law, the state courts should have

further merged his convictions on different charges for the sentencing purposes.  Finally, his

Ground Six asserts that he was "actual[ly] innocen[t]" of all charges: he claims that all State's

witnesses lied, but he elected to omit raising this claim in the state courts.  <u>See</u> Docket Entry No.

4, at 16-41.

## III.     STANDARD OF REVIEW

The general standard of federal habeas review is long-established, and it sets forth a

narrowly-tailored test.  <u>See</u> <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1398 (2011) ("As amended by

AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an

application for a writ of habeas corpus on behalf of a state prisoner").

Thus, Section 2254(a) permits a federal court to entertain only claims alleging that a

person is held in state custody "in violation of the Constitution or laws or treaties of the United

States."  28 U.S.C. § 2254(a).  The AEDPA further limits a federal court's authority to grant

habeas relief by providing that, when a state court has adjudicated a petitioner's federal claim on

the merits, a district court "has no authority to issue the writ of habeas corpus unless the [state court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" Parker v. Matthews, 132 S. Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)).[4]

## IV.    DISCUSSION

### A.    The *Miranda* Challenges

#### 1.    Substantive Test

Pursuant to the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment, a confession must be voluntary to be admitted into evidence. See Dickerson v. United States, 530 U.S. 428, 433 (2000). Miranda also provides that the accused may waive his rights if he does so "voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 475.

---

[4] Consequently, the starting point of federal habeas review under § 2254(d)(1) analysis is to determine the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). A decision is "contrary to" a Supreme Court holding, within the meaning of 28 U.S.C. § 2254(d)(1), if: (a) the state court outright "contradicts the governing law set forth in [the Supreme Court] cases"; or (b) the state court "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. Notably, under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (quoting Williams, 529 U.S. at 410). Correspondingly, the standard posed by federal habeas review "is a difficult to meet, [since it is a] highly deferential standard for evaluating state-court rulings, [and that standard] demands that state-court decisions be given the benefit of the doubt." Cullen, 131 S. Ct. at 1398 (citations and internal quotation marks omitted).February 28, 2013

> [W]hen an individual is taken into custody or otherwise deprived of his freedom
> by the authorities in any significant way and is subjected to questioning, the
> privilege against self-incrimination is jeopardized.  Procedural  safeguards must
> be employed to protect the privilege and unless other fully effective means are
> adopted to notify the person of his right of silence and to assure that the exercise
> of the right will be scrupulously honored, the following measures are required.
> He must be warned prior to any questioning that he has the right to remain silent,
> that anything he says can be used against him in a court of law, that he has the
> right to the presence of an attorney, and that if he cannot afford an attorney one
> will be appointed for him prior to any questioning if he so desires.  Opportunity to
> exercise these rights must be afforded to him throughout the interrogation.  After
> such warnings have been given, and such opportunity afforded him, the individual
> may knowingly and intelligently waive these rights and agree to answer questions
> or make a statement.  But unless and until such warnings and waiver are
> demonstrated by the prosecution at trial, no evidence obtained as a result of
> interrogation can be used against him.

Id. at 478-79.

"The requirement that Miranda warnings be given does not, of course, dispense with the

voluntariness inquiry.  But . . . [c]ases in which a defendant can make a colorable argument that a

self-incriminating statement was "compelled" despite the fact that the law enforcement

authorities adhered to the dictates of Miranda are rare."  Dickerson, 530 U.S. at 444 (internal

quotation marks and citation omitted).

The Supreme Court has made clear that a statement is involuntary when a suspect's "will

was overborne in such a way as to render his confession the product of coercion."  Arizona v.

Fulminante, 499 U.S. 279, 288 (1991).  However, a determination of whether a statement is

voluntary, requires consideration of "the totality of all the surrounding circumstances – both the

characteristics of the accused and the details of the interrogation."  Dickerson, 530 U.S. at 434

(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  These circumstances include

not only the accusations of police coercion, see Colorado v. Connelly, 479 U.S. 157, 167 (1986),

but also such factual aspects as the length of the interrogation, its location, its continuity, the suspects's maturity and experience, and akin.  See Withrow v. Williams, 507 U.S. 680, 693 (1993); see also Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).

In determining whether there has been a valid waiver of Miranda rights, a court must conduct a two-part inquiry under the aforesaid totality of the circumstances standard.  See Moran v. Burbine, 475 U.S. 412, 421 (1986).  First, the court shall looks into the voluntariness of the challenged statements, so to determine whether the waiver was freely and deliberately given as opposed to being obtained by coercion, intimidation, or deception.[5]  See id.  Second, the court must consider whether the waiver was "knowing and intelligent," that is, whether the suspect was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it."[6]  Id.  "[S]ubsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience . . . and familiarity with the Miranda warnings, often require the resolution of conflicting testimony of police and defendant.  The law is . . . clear that *state-court findings on such matters are conclusive on the habeas court if fairly supported in*

---

[5]  Absent police overreaching,"there is simply no basis for concluding that a state actor has deprived a criminal defendant of due process of law."  Colorado v. Connelly, 479 U.S. 157, 164 (1986).

[6]  The "totality of the circumstances" approach is the clearly established federal standard applied to determine whether there has been a voluntary waiver of Miranda rights.  See, e.g., Fare v. Michael C., 442 U.S. 707, 725 (1979); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994).  It looks at the timing of the Miranda warnings and the statement given, and the length and nature of the interrogation and the accompanying detention.  See United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990); United States v. Vasquez, 889 F. Supp. 171, 177 (M.D. Pa. 1995).  Same as the federal bench, the New Jersey state courts have traditionally employed the totality of the circumstances test.  See State v. Presha, 163 N.J. 304 (2000); State v. Miller, 76 N.J. 392, 402 (1978).

*the record*[7] and if the other circumstances enumerated in § 2254(d) are inapplicable." Miller v.

Fenton, 474 U.S. 104, 117 (1985) (emphasis supplied).

### 2.    The State Courts' Findings

Addressing Petitioner's Miranda challenges, the Appellate Division stated:

[Petitioner] was unquestionably in custody, fully aware that a warrant had been authorized or issued, knowledgeable of the factual basis for any charges against him, and at least generally aware of the penal consequences arising from his conviction. . . .  [Petitioner] argues . . . that the police failed to cease their questions "regarding the investigation" when he invoked his right to counsel, and that their discussions regarding the threat by [the son] significantly influenced his determination to waive his Miranda rights.  [Petitioner]  claims that, after invoking his right to counsel, he made inquiries regarding his family, and that Gant wrongly interpreted those inquiries as an invitation to commence substantive questioning.  After thoroughly assessing [Petitioner's] credibility, the [trial] judge found that the facts were not as [Petitioner] had asserted them to be.  The judge relied instead on the testimony of Detective Gant, who stated at the suppression hearing that he only spoke to [Petitioner] regarding his family after [Petitioner] had inquired what now would happen [to him], and Gant had confirmed to [Gant's] satisfaction that [Petitioner] wished to waive his right to counsel.  Gant testified that he did not initiate any conversation with [Petitioner]  even with respect to his family prior to that point.  Further, Gant's testimony reflects that the decision to return [Petitioner] to the interview room and to commence questioning was prompted by [Petitioner's] query regarding what would occur [to him], that Miranda warnings were again administered to [Petitioner] immediately upon his return to that room, and that an explicit waiver of a right to counsel was received before any questioning took place regarding [the Daughter's] allegations.  . . . . . [A]n inquiry by [Petitioner], such as that which Gant believed signified [Petitioner's] willingness to talk and which Gant confirmed through re-administration of Miranda warnings was intended in that fashion, has been found to provide a sufficient basis for a custodial interrogation. [See State v.] Chew, [150 N.J. 30,] 64 [(1997)] ("Well, what is going to happen to me now?" invites discussion of the crime) (quoting Oregon v. Bradshaw, 462 U.S. 1039, 1043-44 (1983)).  We thus affirm the determination to permit the introduction of [Petitioner's] confession at trial.

R.K.V., 2005 WL 3488049, at *6-7.

---

[7]  The government "need prove waiver only by a preponderance of the evidence." Connelly, 479 U.S. at 168.

### 3.     Petitioner's Ground One Warrants No Habeas Relief

Here, Petitioner was administered <u>Miranda</u> warning not once, not twice, not even thrice but four times.  He signed two pre-printed forms verifying his understanding of <u>Miranda</u> rights, and he signed second of these forms twice: to expressly verify that he recognized the rights he was waiving and to affirm that his waiver was voluntary, knowing and intelligent.  Moreover, he was given his first <u>Miranda</u> warning at the very first moment he was taken into custody, and his last <u>Miranda</u> warning (accompanied by a reminder that, initially, he was considering having an attorney present) was administered right before he made his taped confession.

Nothing in the record suggests that he was coerced.  His interrogation was not unduly prolonged.  He was not subjected to any physical force or any form of deprivation.  The moment he stated he might be interested in contacting an attorney, he was removed from the interview room, and all communications between him and Gant ceased.

His two confessions, first made without an audio-tape and the second repeated for the express purpose of taping, offered lengthy accounts consisting of narrative statements given in response to a handful of open-ended questions.  And, as the state courts correctly pointed out, his uninterrupted five-page-long final narrative simply cannot be squared with his confessions being involuntary.  Nothing in the record suggests that his "will was overborne in such a way as to render his confession the product of coercion."  <u>Fulminante</u>, 499 U.S. at 288.   Indeed, one is left to wonder what precautions, short of flatly refusing to talk to Petitioner even after his waiver,

could have Gant taken to ensure against Petitioner's <u>Miranda</u> challenges.[8]  In sum, nothing is the record suggests that Petitioner established the involuntariness aspect of his <u>Miranda</u> claim.

Analogously, nothing in the record suggests that Petitioner's confessions were not "knowing" or "unintelligent."  At all times, Petitioner had his full mental and physical capacities. He was an educated fifty-two-year-old adult with an abundance of common knowledge and business experience.  Furthermore, his initial thought of having a lawyer present indicated he was, ineed, cognizant of his <u>Miranda</u> rights and was intelligently reflecting on the cons and pros of confessing without having counsel present.  Having lost at trial and sentenced to a lengthy prison term, he cannot re-write the record by simply asserting he did not know what he was doing.  The record indicates that both his confessions were as knowing and intelligent as they were voluntary.

In light of the foregoing, the state courts' denial of Petitioner's <u>Miranda</u> challenges were not an unreasonable application of Supreme Court precedent.  Thus, his Ground One will be dismissed.

### B.     Challenges to Petitioner's Sentence

Petitioner's Grounds Two to Five, inclusive, attack his sentence by asserting that it is too lengthy, lengthier than that imposed in matters based on comparable offenses, that the sentence

---

[8]  While Petitioner asserts that he was concerned about the treat his son made, or about the Mother and Daughter, this Court cannot perceive a logical nexus between those concerns (even if actually present) and Petitioner's election to confess.  Since Petitioner's son promised to kill whoever caused Petitioner's arrest, Petitioner's confession (suggesting that the Daughter and Mother were responsible for bringing Petitioner's crimes to the attention of police) only put the Daughter and Mother in immediate danger of the son's revenge.  Hence, had Petitioner been concerned about the possibility of his son committing a criminal offense, Petitioner had no reason to confess or, at the very least, to speed up the events by proceeding without counsel present.  Analogously, if Petitioner wished to reunite with the Daughter and Mother, he had no reason to confess: had he been adamantly refuting the charges, there whereabouts might have been released to him.

qualifies as cruel and unusual punishment which also not comply with the state law, that Petitioner expected his sentence to be shorter as a "reward" for his confessions, etc.  None of these challenges has merit.

Sentencing is generally considered a matter of state criminal procedure, which does not fall within the purview of federal habeas review.  See United States v. Cepero, 224 F.3d 256, 267 (3d Cir. 2000), cert. denied, 531 U.S. 1114 (2001); Ervin v. Beyer, 716 F. Supp. 163, 165 (D.N.J. 1989); Grecco v. O'Lone, 661 F. Supp. 408, 415 (D.N.J. 1987); see also Johnson v. Beto, 383 F.2d 197, 198 (5th Cir. 1967), cert. denied, 393 U.S. 868 (1968).  Absent some constitutional violation, federal courts cannot review a state's alleged failure to adhere to its own sentencing procedure.  See Rorie v. Beard, 2005 U.S. Dist. LEXIS 23813 (E.D. Pa. April 7, 2005) (citing Branan v. Booth, 861 F.2d 1507 (11th Cir. 1988)).  Thus, a federal court will not reevaluate a sentence in a habeas proceeding unless it exceeds the relevant statutory limits.  See Jones v. Superintendent of Rahway State Prison, 725 F.2d 40 (3d Cir. 1984); see also Williams v. Duckworth, 738 F.2d 828, 831 (7th Cir. 1984), cert. denied, 469 U.S. 1229 (1985) ("As a general rule, federal courts will not review state sentencing determinations that fall within statutory limits"); Bonner v. Henderson, 517 F.2d 135, 136 (5th Cir. 1975) ("This Court will not upset the terms of a sentence within statutory limits unless so disproportionate to the offense as to be completely arbitrary and shocking").  Moreover, federal courts will not interfere with a state's sentencing scheme unless the petitioner can show that no reasonable sentencing court would have invoked the same relevant considerations to justify imposition of such sentence.  See Lewis v. Jeffers, 497 U.S. 764, 783 (1990).  "While normal sentencing proceedings are not immune from all due process attacks, the Supreme Court has required only minimal due process protections in

14

those proceedings." United States v. Davis, 710 F.2d 104, 106 (3d Cir.), cert. denied, 464 U.S. 1001 (1983) (citations omitted).

Here, Petitioner failed to demonstrate that his sentence violates any federal constitutional rights.  Moreover, his individual sentences or their aggregated total did not exceed the relevant statutory limits, nor could these sentences shock the judicial conscience.  Accord Harris v. United States, 536 U.S. 545, 557 (2002); Wainwright v. Goode, 464 U.S. 78, 84 (1983).  The trial judge's reliance on the statutory regime invoked by the indictment was wholly reasonable and by no means arbitrary; and, if the Court were to presume that any state law errors took place, these state law aspects form no basis for habeas relief.[9]

With the same token, Petitioner's assertion that his aggregate sentence is a violation of the bar against cruel and unusual punishments is unavailing.  While the Eighth Amendment forbids the imposition of "cruel and unusual punishments," a sentence violates the Eighth Amendment only when it is both (a) extreme, and (b) "grossly disproportionate to the crime." Harmelin v. Michigan, 501 U.S. 957, 1001(1991) (Kennedy, J., concurring) ( concluding that the Eighth Amendment contains only a "narrow" proportionality principle, which does not require "strict" proportionality between the crime and sentence.  In determining whether a sentence for a term of years is grossly disproportionate for a particular crime, the Court must begin by comparing the gravity of the offense and the severity of the sentence.[10]  See Harmelin, 501 U.S.,

_____

[9]  Analogously, Petitioner's disappointed hopes that his confessions might be gratified by a shorter sentence do not state a cognizable federal claim or a legal claim of any sort.

[10]  The Supreme Court reiterated this narrow proportionality review in Graham v. Florida, 130 S. Ct. 2011, 2022 (2010).  There, Chief Justice Roberts explained as follows:

(continued...)

at 1005.  In the rare case in which this threshold comparison leads to an inference of gross

disproportionality, the Court should then proceed to comparing the sentence at issue with the

sentences received by other offenders in the same jurisdiction and with the sentences imposed for

the same crime in other jurisdictions.[11]  See id.  Here, Petitioner systemically molested his

Daughter – not for a few seconds but for a decade, ignoring her pleas to stop the abuse.  His

aggregated term of twenty-eight years minimum and sixty-seven years maximum is not grossly

disproportionate to the crimes he had committed and, thus, does not violates the test detailed in

Graham and in the case law from which the Graham rationale was derived.[12]  See, e.g., Norris v.

---

[10](...continued)
Our cases indicate that courts conducting "narrow proportionality" review should
begin with a threshold inquiry that compares "the gravity of the offense and the
harshness of the penalty."  Solem, 463 U.S., at 290-291.

Id.

[11]  In all other respects, Petitioner's claim asserting disparate treatment is, necessarily,
facially meritless.  The Court of Appeals expressly pointed out that "[t]he contention that gross
disparity in sentences violates due process or equal protection lacks merit."  Jones, 725 F.2d ar
43.

[12]  Employing this test, the Supreme Court upheld a sentence of life without parole for
possession of a large quantity of cocaine, see Harmelin, 501 U.S. at 994-95 (1991), a challenge to
a sentence of twenty-five years to life for theft of a few golf clubs under a state recidivist statute,
see Ewing v. California, 538 U.S. 11, 28-31 (2003), and a similar sentence imposed on a
defendant convicted on two counts of petty theft.  See Lockyer v. Andrade, 538 U.S. 63, 73-77
(2003).  The Supreme Court also upheld a sentence of life imprisonment with eligibility for
parole for a defendant convicted of his third felony theft offense involving the acquisition of a
relatively small quantity of property, i.e., fraudulent use of a credit card to secure $80 worth of
goods, passing a forged check in the amount of $28.36, and obtaining $120.75 by false pretenses.
See Rummel v. Estelle, 445 U.S. 263, 285 (1980).  The Supreme Court also upheld a forty-year
sentence for possession with intent to distribute and actual distribution of marijuana. See Hutto v.
Davis, 454 U.S. 370, 373-75 (1982).  However, in Graham, the Supreme Court held that the
Eighth Amendment "forbid[s] States from making the judgment at the outset that" defendants
"convicted of nonhomicide crimes committed before adulthood will remain behind bars for life."
(continued...)

Morgan, 622 F.3d 1276 (9th Cir. 2010) (affirming a life-without-parole sentence based on the

defendant's offense consisting of touching a five-year-old girl on her "privates" or "genitalia"

area; such touching was performed over her clothing for at most "a couple of seconds."  Prior to

that offense, the defendant had two convictions unrelated to sexual assault: robbery and theft).

> "[T]he impact of [child molestation] on the lives of [its] victims is extraordinarily
> severe."  Cacoperdo v. Demosthenes, 37 F.3d 504, 508 (9th Cir. 1994); see
> Stogner v. California, 539 U.S. 607, 651 (2003) (Kennedy, J., dissenting) ("When
> a child molester commits his offense, he is well aware the harm will plague the
> victim for a lifetime").  Indeed, while "psychological or physical harm is
> necessary to constitute 'abuse,'" United States v. Baza-Martinez, 464 F.3d 1010,
> 1017 (9th Cir. 2006), "[t]he use of young children [by adults] for the gratification
> of sexual desires constitutes an abuse. . . .  It constitutes maltreatment, no matter
> its form."  United States v. Baron-Medina, 187 F.3d 1144, 1147 (9th Cir. 1999);
> see, e.g., United States v. Valencia-Barragan, 600 F.3d 1132, 1136 (9th Cir.
> 2010).  "[W]e and our sister circuits have [therefore] consistently held that sexual
> offenses [by older adults] against younger children constitute 'crimes of
> violence.'"  United States v. Medina-Villa, 567 F.3d 507, 515 (9th Cir. 2009).

Id. at 1294 (brackets in original).

Therefore, even if the Court were to ignore Petitioner's failure to meet the threshold

requirement of the Harmelin analysis, Petitioner's Eighth Amendment challenges fail to meet the

second requirement too.

For these reasons, Petitioners' Grounds Two to Five, inclusive, will be dismissed, since

the state courts' denial of Petitioner's claims attacking his sentence as unduly excessive was not

an unreasonable application of the relevant Supreme Court precedent.

---

[12](...continued)
Graham, 130 S. Ct. at 2030; accord Roper v. Simmons, 543 U.S. 551 (2005) (finding capital
sentences for juvenile offenders disproportionate); Atkins v. Virginia, 536 U.S. 304 (2002)
(same, with regard to capital sentences for offenders whose intellectual functioning is in a low
range).

### C.    Petitioner's "Actual Innocence" Claim

Finally, Petitioner's Ground Six asserts that he is "actually innocent" of all charges raised against him.[13]  Petitioner concedes that this claim was not exhausted in state courts.  Generally, such fact renders the Petition "mixed" and, correspondingly, subject to dismissal unless Petitioner withdraws his Ground Six or duly obtains stay and abeyance. See Mahoney v. Bostel, 366 F. App'x 368 (3d Cir. Feb. 24, 2010).  However, since this Ground Six is facially meritless, the Court has the mandate to deny it on the merits "notwithstanding the failure of the applicant to exhaust."  28 U.S.C. § 2254(b)(2).

Here, Petitioner was tried to the jury and found guilty of the multiple charges underlying his convictions.  This, correspondingly, means that his guilty verdict was the jurors' factual finding that Petitioner was neither "innocent" nor even lacking guilt beyond a reasonable doubt.  "Factual issues determined by a state court (jurors included) are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence."  See Gambino v. Warden of N.J. State Prison, 2013 U.S. Dist. LEXIS 52, at *63, n.28 (D.N.J. Jan. 2, 2013) (citing Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000), citing in turn, 28 U.S.C. § 2254(e)(1)).  Here, Petitioner offers this Court no clear and convincing evidence of his alleged innocence.  In fact, he offers no evidence at all short of his self-serving, bold conclusion that all State's witnesses must have lied.  So pled, Petitioner's Ground Six merits no habeas relief.

Therefore, this final Ground will too be dismissed.

---

[13]   The Court notes that it is not entirely clear as to the logic of Petitioner's lengthy but nonetheless obscure argument asserting that Petitioner somehow elected: (a) not to mention his innocence from the moment he was taken into police custody and until he lost on his appeals; and (b) manufactured his extensively detailed confessions so to ensure for safety of his son and to act upon other emotional considerations that cannot be coherently distilled from his pleading.

18

## V.  CERTIFICATE OF APPEALABILITY

The Court denies a certificate of appealability because Petitioner has not made "a

substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).  See

Miller-El v. Cockrell, 537 U.S. 322 (2003).

## VI.  CONCLUSION

Based on the foregoing, the Court dismisses the Petition with prejudice and declines to

issue a certificate of appealability under 28 U.S.C. § 2253(c).




 s/Robert B. Kugler
**ROBERT B. KUGLER,**
**United States District Judge**

Dated:  March 5, 2013